**George R. SLATER, Plaintiff,**

v.

**GEORGE B. CLARKE AND SONS, INC.,**
**a corporation of the State of New**
**York, et al., Defendants.**

**Civ. A. No. 2113.**

United States District Court
D. Delaware.

Aug. 26, 1960.

Jackson W. Raysor, of Tunnell & Raysor, Georgetown, Del., for plaintiff.

William Prickett, Jr., of Prickett & Prickett, Wilmington, Del., for defendants.

LAYTON, District Judge.

These are two actions by the plaintiff, George R. Slater, of Sussex County, Delaware, and the defendant, George B. Clarke & Sons, a New York corporation, growing out of certain business relations between the plaintiff and the Clarkes in late 1957 and early 1958. Civil Action No. 2113 involves a claim based on promissory estoppel. Civil Action No. 2061, D.C., 186 F.Supp. 817, concerns a claim for payment on a road contract and claims involving rentals of road equipment.

As to Civil Action No. 2113, Slater had been in the contracting and road building business for some years in Sussex County. He had a partner, Rogers. Later, in 1954, the partnership was incorporated as Slater & Rogers, Slater taking 75% of the stock and Rogers 25%.[1] Actually, Rogers' stock was never issued to him. On November 15, 1957, Rogers died and his wife was named administratrix of his estate. The sole asset of Slater & Rogers was approximately $100,000 worth of road equipment. Slater was badly pressed for money.

Early in 1958, Mrs. Rogers, as Administratrix of her deceased husband's estate, brought a Chancery action to compel Slater to convey 50% of the stock of Slater & Rogers to her.

While this action was pending, Slater was looking for a new partner with substantial capital and experience in certain phases of the business which he lacked. He had approached a number of individuals in the hope of attracting such a person to fill the vacancy created by Rogers' death.

Among those persons was one Olton, an engineer for the defendant corporation which had certain contracts in Delaware. Olton knew that the Clarke brothers, who owned defendant, were interested in obtaining an entree into the road building program in lower Delaware and told them about his conversations with Slater. As a result, Walter Clarke came to Delaware in early March, 1958, talked to Slater, looked over his equipment and then went with him to the law office of one Dean Betts, Esquire, of the Delaware Bar, where further conversations were held. In the course of these discussions, the question of disposing of Mrs. Rogers' claim for 50% of the stock in Slater & Rogers became important for, obviously, no one would go into such a deal without a settlement of that claim. Slater understood this. He and Betts had hitherto offered $5,000 in settlement thereof which had been refused and a counter offer of $20,000 made. Both Betts & Slater felt at this time, and so stated, that the suit could be settled for approximately $15,000 or a little more. Clarke then told Betts to draw up a draft of contract by the terms of which George B. Clarke & Sons, the defendant, would purchase 49% of Slater & Rogers for $50,000. Slater would get a managing job for ten years at $125 per week and the down payment on the $50,000 agreement would be the amount for which Slater could settle the Rogers' Chancery action. Walter Clarke told Slater to expedite this settlement for he wished to close out the deal in the next two or three weeks. Slater borrowed money and settled the Chancery case for $17,500. Betts sent a draft of the proposed agreement to Clarke and on April 23rd, Slater, Betts and Davis, an accountant, went to Long Island to have further discussions concerning the deal. At this meeting, the Clarke brothers took a firmer position. They would pay $40,000 for a 51% interest but Slater would get no guaranteed job with the corporation. Their lawyer was instructed to draw up such an agreement. Some time after this, a draft of agreement was received by Slater and he telephoned the Clarkes that it was acceptable. Nothing further was ever done.

Slater subsequently inquired as to the delay and was informed that defendants'

1. Slater said that he had paid off a $10,000 indebtedness owed by Rogers and given him 25%, instead of 50% of the stock, because of paying this indebtedness.

bank was holding up the financing. This was not true. The Clarkes had cooled to the deal. Once again Slater saw Walter Clarke in Seaford, Delaware. He asked Slater if he could not work out a similar deal with someone else. Slater was just then called to the telephone and never answered Clarke nor did he make any effort to come back and discuss the situation with Clarke.

Other findings of fact will be made in the course of the opinion.

■ The plaintiff bases his claim for recovery for the alleged breach of defendants' promise upon the doctrine of promissory estoppel which is defined in Restatement, Contracts, Sec. 90 as a

"Promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

See also Chrysler Corporation v. Quimby, 1 Storey, Del., 264, 144 A.2d 123.

■ Applying this principle to the facts here, I have no doubt that the Clarkes induced Slater to go ahead and settle the Rogers' action on the best terms possible, the amount of the settlement to represent the down payment. Nor do I have doubt that Slater, relying on this inducement, proceeded to settle the Rogers' suit for $17,500. However, after a careful consideration of all the evidence, I cannot conclude that plaintiff has proved by a preponderance of the evidence that injustice can be avoided only by an enforcement of the Clarkes' promise. In discussing my reasons for this conclusion, I pass over the fact that the negotiations of March 5, where the inducement to settle was made, were obviously far from final in character.

Slater was desperate for money. He had to attract a man or corporation with substantial new capital and the experience to supply his own deficiencies. It would be plain to anybody that the claim by Mrs. Rogers for 50% of the stock of Slater & Rogers had to be disposed of before a person or corporation could be expected to buy in. Therefore, Slater in settling the Rogers' claim, was doing only what he had to do or would have to do with any other new prospect interested in joining in with him. It follows then that if the terms of the settlement were fair, no substantial injustice resulted from the breach of promise.

Was the settlement fair? I think it was, or came so close to being that it would be impossible to ascertain any real damages flowing therefrom as a consequence of the breach.

The machinery and equipment owned by Slater was worth about $100,000. Mrs. Rogers was claiming a 50% stock interest. Slater conceded she was entitled to 25%. The Chancellor may have found a higher percentage of stock due her for all we know. If Mrs. Rogers was entitled to 25% of the stock, this did not necessarily mean that her stock interest was worth a quarter of the assets or $25,000. Nor, contrary to Slater's contention, did it necessarily mean that it was worthless because a minority interest in a closely held family corporation, according to him, has no value at all.

Because Slater needed money so badly and could not obtain it through an amalgamation without first settling the Rogers' suit, it is obvious that the claim of Mrs. Rogers represented a substantial nuisance value. Just what that value was cannot be exactly ascertained but discussion between counsel for Mr. Slater and Mrs. Rogers had disclosed that the settlement would have to be in terms of $15,000 or more and this was known prior to the meeting of March 5th. Nor can it be successfully argued that Slater settled on much higher terms simply as a result of the Clarke promise for the reason that the proceeds of the settlement would come out of Slater's, not Clarkes', pocket. Slater was a business man and never once does the record disclose that he thought a $17,500 settlement was unfair or that he would not have paid $17,500 if it had not been for the inducement from the Clarkes. More-

over, his own attorney, Mr. Betts, upon whose testimony I have relied heavily, advised him to settle for $17,500 because, as he said, anytime you can settle a $25,000 claim for $17,500 and turn around and sell it again for $25,000, that is good business.[2]

I conclude, then, that Slater in relying upon the inducement of the Clarkes to settle, (1) paid no more than the Rogers' claim was worth, (2) and would have had to settle the claim anyhow no matter with whom he dealt before he could have attracted a badly needed partner with capital into his business. Consequently, I cannot see how Slater was damaged to the extent that injustice could be avoided only by enforcing the promise.[3]

It necessarily follows that the principle of promissory estoppel is not applicable in this case.

Let an order be entered in accordance herewith.

2. Record, P. 95.
3. Other factors which, from hindsight, tend to strengthen the conclusions here reached are (1) after Slater knew that the Clarke deal had fallen through, he stated that he was much better off and was glad he had never gotten involved with the Clarkes and (2) shortly thereafter, he sold a substantial majority of his stock in Slater & Rogers to James Julian for about $37,000. True, he gave up more stock than in the Clarke deal but he got nearly as much cash and, most importantly, obtained and still holds a job with Julian at $125 weekly which the Clarkes refused to promise him.

